Okay, when you're ready, counsel. Thank you, Your Honor. May it please the Court, I'm Joseph Walsh, the attorney for Mr. Karen Markosian, the first appellant. All three, or excuse me, out of the five appellants before the Court, only the first four will be arguing, so we'll be dividing equally for seven and a half minutes for each of the four, first four appellants. Okay, and do you intend to save some time for rebuttal? I don't, Your Honor. I'm going to use my seven and a half minutes opening. The issue of Mr. Markosian in Mr. Markosian's case is entirely and directly related to the appeal, and I think there's so many issues that the best use of my time is to focus on the amount of a loss under the guidelines that was calculated in the case. Mr. Markosian was given a sentence of 159 months, which was 21 years and seven months, for conspiracy to commit bank fraud, attempted bank fraud, and aggravated identity theft, and in the district court, he was arguing that under the guidelines, he should only have received a 61 sentence, so there's a very large discrepancy between the 259-month sentence that was imposed and the 61 sentence that his counsel argued in the district court was supported by the record in the case. At trial, the government proved that Mr. Markosian was working for Mr. Sherpatrosian, who was one of the inmates at Avenal State Prison, and his involvement was in the bank fraud conspiracy was shown through the wiretap evidence to be only a one-month period in August of 2009, and the evidence at trial and the evidence that was summarized in the pre-sentence report was that he had tried to take money from four victim bank account holders who were all specifically named in the indictment. It was Ms. Caro, Ms. Lambranos, Mr. Abaddon, and Mr. Viad, and all four of those victims testified at the trial, and all four testified that they didn't lose any money because the losses were avoided by the FBI, who had a wiretap on Mr. Sherpatrosian's telephone in prison, and they were able to notify the banks not to process any of the forged checks, so it was argued in the district court that if you take the total amounts that were in the bank accounts of these four victims and add them up, it comes out to $992,000, which places it under the loss figure between $400,000 and $1 million, which only calls for conspiracy, right? And he was convicted of conspiracy. So where did Judge Carter go wrong in applying reasonable foreseeability and relevant conduct and all the other notions to hold him accountable for far more? I think what the precise error that was committed by the district court and by the probation office was to fail to apply the guideline provision that governs the application of determining a loss for jointly undertaking criminal activity. And the guidelines specifically state that it is not necessarily the same as the entire scope of the conspiracy. The guidelines require the district court to make a finding of the scope of the criminal activity that the particular defendant agreed to undertake. And so we know from the cases on this, it shows that a defendant is not responsible for the losses that occurred before he joined the conspiracy. And he's also not responsible for the losses that occur after he ceases to become involved in the conspiracy. And that's the problem that occurred in this case. The district court didn't recognize the fact that the evidence only supported Mr. Markosian's involvement in August of 2000. But was there any evidence of anything Markosian did of this nature after the summer of 2009? Absolutely none. I reviewed the... I mean, quite aside from his any direct connection to the conspiracy, did he do any... I mean, it's hard to keep these people straight. So some of them were still doing similar things, whether with the same people or not later on. Was there any evidence of anything he did later on? None, Your Honor. Mr. Markosian's conduct was very discreet. And I waited for the government's brief to show me what they were talking about concerning the activity of Mr. Markosian. What's the government's brief saying? And the government responded with all the telephone calls from August of 2009 and all the activity in August of 2000. Mr. Markosian was involved in recruiting Mr. Margarian to take one of the forged checks to the bank and Mr. Markosian allowed him to use his car. And then the car was and the other passenger were arrested. So what period did the trial court find Markosian responsible for? He started with July of 2009, which is the month prior, because there was one telephone call July 28th. And then he said, Mr. Markosian is responsible for everything from July of 2009 to the date of the arrest when everything was shut down, which is... February 2011. Which is an 18 month period. And when the case was ended in 2011, February 2011, all the search warrants went out, all the arrests occurred, and they found a lot of material in the homes of all the other co-conspirators. And they were added to the mix. And if you look at the statement of loss, losses were added for everything that was found in all these homes, but nothing was found in Mr. Markosian's home. He was arrested, nothing was found on his person. And so there's a complete absence of any evidence after... He wasn't in custody after August of 2009, was he? No, he was not in custody at all. It was Mr. Sheriff Petrosian and Mr. Brown that were the persons that were... Did he do anything either affirmatively or in some way to repudiate the conspiracy? No, and he doesn't have to. That was the issue that was raised in the Spotted Elk case that I cited because the district court in Spotted Elk said, well, yes, we understand that after the where he was participating continued on after he moved out of town and he stopped participating. And the district court there said, well, you have to withdraw from the conspiracy. You have to notify other people that you're withdrawing and do something to prevent the conspiracy. And the court of appeal there said that that's not true. Well, it's true as to the conspiracy, right? It's true as to the substantive guilt of the conspiracy, yes. But as to the determination of the loss, all that has to happen is you have to cease involvement in the conspiracy. And that's supported by the guidelines section. They have the eight examples of how do you determine what's within the scope of the conspiracy. And the first example is where D asks, pays E to forge an $800 check, and then D, unknown to E, then takes the $800 check and tries to fraudulently obtain $15,000 worth of merchandise. And they said under those circumstances, E who forged the check is only responsible for the loss of the 800, but is not responsible for the activities involving the 15,000. And because that's not in furtherance of the criminal activity that E jointly undertook with D. And so that's what the Spotted Elk case and the Morrow case, and even the Latham case, the Ninth Circuit Latham case. And they basically established the principle that in terms of determining the loss, if a person ceases to be involved in the conspiracy, either it's a drug selling conspiracy or a fraud conspiracy. To be involved, meaning, I mean, this is sort of what Judge Pius is asking. Ceasing to be involved, meaning what? Meaning he wasn't doing overt acts anymore, or meaning... Stopped committing the crime. What? It ceases means he stopped committing the crime. Meaning what? Meaning... Meaning he no longer participated in the conspiracy. Meaning he didn't do overt acts, meaning he... In other words, a conspiracy is an agreement. He was part of the agreement. The question is, does he have to stop? Does he have to withdraw from the agreement? And if not, what does he do to stop? All he has to do is stop participating. Meaning what? That's what I'm asking you. Meaning don't do overt acts anymore, or don't, you know, say I don't like you anymore, or what? He has to leave the environment and stop participating. His participation, Mr. Markosian's participation, was to locate accounts where they could put... Well, those were all overt acts, so your answer is he has to stop doing overt acts. Stop doing overt acts, yes. And so he pleaded not guilty. He went to trial, and the government only proved that his involvement was August of 2009, and they had the victims come in, they had... They had to prove that he was a member of the conspiracy. Yes, and he was guilty of the conspiracy. He was convicted of a conspiracy that ran for a certain period of time. Yes, but in terms of the loss, we have to determine, or the district court... Well, when you get into conspiracy, you get into notions of reasonable foreseeability and conduct of your co-conspirators. But they have to be reasonably based on the evidence, and if you look to that example of the D and the E, and they give them the guidelines, and say, so if two people get together, you ask one person to forge a check, and then you take that check back and you leave, and then you do something criminal with that check that the forger doesn't know about... Well, the question was whether that example is an example of the fact that this other activity was not in furtherance of the conspiracy, or whether it's an example of the fact that it is in furtherance of the conspiracy, but not part of the joint activity. It's very fuzzy concepts, which I also am having trouble with. In other words, because you... I mean, as far as the conspiracy is concerned, you only have to have one overt act, or maybe even none, I don't know in this context. So how do we know that that example is not an example of activity that was not in furtherance of the conspiracy, because nobody had agreed to do that other thing? Well, the government has to prove that the defendant continued in the conspiracy, if there's an objection, which there was in this case, that he was only involved in August. And now the burden of sentencing is the government now has to prove that the scope of his conspiracy encompassed all of these other things, when there's a total lack of evidence in the case. And I think that... Well, I mean, is it really your argument is that he didn't intend any further losses than what he was involved in? No, the argument is he stopped, because what happened... He didn't intend any further losses. He intended to walk away from the crime and to no longer participate, no longer commit overt acts, no longer engage in stealing. And that's what he did. And it's like the Morrow case. I cited the United States versus Morrow, where there was a company and several of the employees were held for losses after they had quit the company. In other words, they participated early in the conspiracy and they were selling lots fraudulently, but then they quit and they were tagged with all of the losses. And so are you arguing that this is the hard part, that he was no longer part of the conspiracy? Or are you arguing that there's a different standard and exactly what is it? I'm arguing that, yes, he's a part of the whole conspiracy, but in determining what is the amount of loss, you have to look at the scope of what he intended to do, what he... But he didn't intend to cause any further losses. Other than what he did. Other than what he did. That's your argument. That's my argument, that he joined the conspiracy in August and he intended to steal during the month of August. Isn't that a tantamount to saying he withdrew from the conspiracy on September 1? I mean, isn't that what you're saying? Yes, exactly. That's tantamount with what I'm saying. And that's what his lawyer argued. So you, on one hand, are arguing they're different, but really you're not arguing they're different. You're really arguing they're the same. No, the issue of his guilt is different from the issue... I mean, some of the cases do seem to say it's a different question. And I'm trying to get my hand on what the different question is. But you seem to be saying it's not a different question. It's the same question. Which question? That he withdrew from the conspiracy. Well, withdrawal is a much more onerous thing to do, but simply ceasing criminal conduct is much easier. You can walk away from the scheme. The scheme was unsuccessful because they were being wiretapped. And so every scheme was falling through. It was no longer something that he wanted to participate in. Let me ask it this way, if I might. Don't worry, we won't take his invasion of your time and hold it against you. So you can relax. Was Spotted Elk argued to Judge Carter? No. What was argued to Judge Carter was that the amount of loss only was the $900,000 that he was involved in in August. But was the principle being applied by Judge Carter that in order not to be responsible for money outside that $900,000, he had to have withdrawn from the conspiracy? Or was Judge Carter made aware of the Spotted Elk test that says that in order not to be held for purposes of sentencing, withdrawal from the conspiracy is not the test? That wasn't expressly argued, but the concepts were. So the Spotted Elk case was not mentioned to Judge Carter? No, but the guidelines sections that we were dealing with were those sections dealing with jointly undertaking criminal conduct. I mean, essentially, you come to a point in the guidelines where you say Defendant A is responsible for what Defendant B did, but only if it's within the exact scope of what he agreed to do and what he agreed to steal. And it was factually argued to the judge. The judge had the guidelines available to him, and the judge chose to hold him responsible for everything till the end of the conspiracy for 18 months. And there was no evidence that he was involved. And we had a full trial. He had a full trial. And was there any evidence that he might have benefited from the continuation of the conspiracy? Not in the case of Karen Markosian. They simply had the wiretap that clearly proved he was a part of the conspiracy. But during that month of August, nobody could make any money because they were being wiretapped. And at one point, they even dissociated themselves from the two gentlemen that were arrested in the car with the stolen check. They fired them. They said, Get them out of here. We don't want them involved anymore. And then there was a complete silence concerning Mr. Markosian. He just drifted away. Was there a finding with regard to foreseeability? Yes, there was. But it had no basis in fact. And in fact, the finding regarding foreseeability was one sentence. I find it was foreseeably liable that Markosian's involvement in August continued for 18 more months despite no factual underpinnings. And if you compare it to the same finding... And what you're asking for is a remand to Judge Carter to reconsider the sentence in light of Spotted Ale? Yes, but we're asking for a different remand to a different judge based on the last argument in the brief that we felt that the judge had an appearance of impartiality. Had lost the appearance of impartiality. But you're asking to go back to whoever the sentencing judge is and re-Spotted Ale and then re-sentence? Yes, Your Honor. And another reason why I think there should be a remand because the co-defendant, Mr. Sheriff Petrosian, if you compare the amount of loss in his case, the judge says, Well, we're going to take July of 2009 when we learned about you guys, and we're going to go to April of 2010 when Mr. Sheriff Petrosian got out of the Avanel State Prison. Well, that resulted in an 18-level increase and my client got a 20-level increase. And the government even conceded that my client shouldn't get the 20, he should get the 18. But then judge gave him the 20. And now on appeal, they're saying, Well, just affirm it. And there's really no factual basis of Karen Markosian being involved in any activity beyond the end of August of 2009. Okay. Thank you. Thank you very much. Why don't we do it this way for the next arguer. Let's just put seven minutes and 30 seconds on the clock. Good morning, Your Honors, and may it please the court. My name is Mark Ebert, and I represent Mr. Angus Brown. The court's questions and Mr. Walsh's answers, which I agree with, go to the legal heart of what I was about to say to you, which is the difference between the standard for conspiracy liability versus the standard for sentencing liability for amount of loss, number of victims, and so on. Brown seems to be in a very different position. Oh, I have different facts, and that's the other part of what I was going to say. I just wanted to point out that I would add to what Mr. Walsh said, that there's not just the Spotted Elk case. There's two Ninth Circuit cases, which establish that the standard is different and that for sentencing guideline purposes, it is the scope of the individual's undertaking and his matter for determining amount of loss, number of victims, and so on. And those are the Latham case, where the person was involved with a company and tax fraud for three years, left the company for three years, came back and rejoined the conspiracy. He was not held liable for the three years that he was away. He may have assumed they were still doing it while he was away, but he wasn't liable. That's not the situation we have with Mr. Brown. Okay, and the other one I just wanted to say is the Johnson case, where he went to jail and therefore was not allowed. All right, the factual difference with Mr. Brown is this. He pled guilty to the conspiracy and or conspiracies, according to the government's witness, who said they were actually two separate. In fact, there was only one conspiracy alleged, and that's what he pled to. Well, but the fact is that the evidence at trial was that they were three. He pled guilty, and yeah, he pled guilty, and he's not denying that. And he also pled guilty to, what he really pled guilty to, was conspiring with various individuals who were named and others. And he also pled guilty to every instance in which he was charged with performing overt acts or other fraudulent acts. The important point of that is that two of those occurred during the brief periods when he was not in prison, and all of the rest occurred when he was at Avanall State Prison. And the difference with Mr. Brown is that all of the time out of prison was very small. He got very little freedom. What period, what time, what was the date of that? Okay, the Avanall was... I know Avanall was. What about the other? Oh, there was a brief period in 2007, which is... And what about at the other end? There was a May 31st, 2005. And what about after 2009? Nothing. He was in prison for the rest of the time? Yes, and the problem with him is that during that six years, he was in 13 different prisons. So what? He was very good at writing things for whatever prison he was in. Well, again, under Spotted Oak, Latham, and Johnson, if he's not able to participate, or if he's not participating... How do we know he's not able to participate? I'm sorry? Who says he's not able to participate? I think the question is, did the government prove by clear and convincing evidence that he did? And there is nothing on that. There is nothing on that. And the problem is that he is being sentenced based on what you call one conspiracy or three. He's being sentenced based on everything that all these people did while he was in different prisons. Judge Carter emphasized this, with respect to Mr. Brown, that he was, you know, he was one of the ringleaders of the whole thing. The conspiracy was Avenal prison-based, and there is no evidence before the sentencing judge that other than... That's the conspiracy that he was convicted of, because the conspiracy he was convicted of began in 2005. He conspired with named individuals and others during the period 2005 to 2009. And he wasn't in Avenal prison until 2009, right? He was in Avenal prison for a few months in 2009. Right. And he was in Avenal prison for a very short time back in 2005. And he was in 13 different prisons all the other time. You're defining a different conspiracy from the one he was convicted of. If there was any conspiracy at that time at all, again, the government has the burden of proof. The government said at sentencing that it was clear and convincing evidence was the standard. But he pled guilty to a conspiracy from 2005 to 2011, right? Again, the standard for conspiracy liability under those cases that I've cited, and under the sentencing guidelines, is different from his liability. I understand that, but you said there was no conspiracy at all. He pled guilty, as I understand it, to a single conspiracy from 2005 to 2011. So although the liability for loss and for purposes of guideline confirmation is different, you can't begin by saying, by getting away from that fact. There was a conspiracy and he was in it from 2005 to 2011. I think the way I read that, Your Honor, and the cases that I was talking about point this out. Part of the reason for the difference is that conspiracy indictments are worded very broadly. And in his mind, and based on the facts of this case, it's clear. He conspired with each of the named individuals and others during that time period. All we're And that's a completely different standard. Is there anything in the record about any activities of this kind after August of 2009? There's no evidence of that. In fact, if you look at the... What about Bell and the guy who testified, whose name I'm forgetting? Cole Benson. What? Cole Benson. Benson and so on. I mean, didn't Wertheit continue to do things like that? I don't believe so. And in fact, after 2009, and I'm looking at Volume 2, page 33 of the excerpts of record where we have the entire prison history of Mr. Brown, where he was at what time, which prisons, the brief periods he was out, the times in which he had no access to telephones, and even a period of five months during the conspiracy period, where he was in prison on this conspiracy, for this conspiracy, and that was included too. But from 2009 on, he was in one, two, three, four, five, six, seven different jails. What I want to know is what evidence is there in the record of what the people that he was most directly working with were doing during that period after August of 2009? I don't know of anything beyond then, because that was what the trial of their cases focused on, was the 2009 Avenal conspiracy period where they were wiretapped. What I know is that Mr. Brown, as to Mr. Brown, there was no evidence that he continued after that when he was being shunted from prison to prison to prison. In fact, if you read the government's brief, you see they cite 300 phone calls among the various conspirators, none of which were to Mr. Brown. So, I mean... So what's the bottom line? I mean, how much do you contend that he should have been only held liable for in terms of loss? That's a good question. And how do you get there? Okay, that's right. That's a good question. Thank you. 1.4 million of those checks were created while he was in Avenal. And then there are two others, 1.4 million. 1.4 million. Right, were created. Not all of those were cash. Not all of those were people who suffered pecuniary loss, so they wouldn't all count. And at the other end of the spectrum, he was responsible for $46,000 of the actual loss himself. So what the defense lawyer argued... What about intended loss during the period that he... The intended loss during his Avenal period would have been 5.2 million. Trivial. There were two instances in which he was caught with, I believe, somebody's ID when he was outside of prison. But the answers to your question are, the number of checks that were created while he was in Avenal totaled 1.4 million. The intended loss was 5.2 million during the Avenal period. But we haven't got time to get to the other issue, which is the pecuniary loss to those people, which was a lot less. And he did himself $46,000 worth of fraud. But the government's position, therefore, is this is all, no, never mind, right? No, never mind, but... Because the actual loss is also intended loss. And when you add it all up, it's over the guideline. There's no way to be precise. It does have to be a reasonable estimate. What defense counsel argued for was something essentially in between, which was between $400,000 and $1 million, which is anywhere from 10 to 30 times more than the proven loss that he was involved in. And even if you go up to $1.4 million or $5.2 million, contrary to the other issue we haven't gotten to, it's still significantly less than he received. Okay, thank you. Good morning. My name is Ben Coleman. I represent Mr. Sheriff Petrosian. I'm going to try to save a minute for rebuttal, but that may be ambitious. I want to first touch on loss, and then I would like to address my ex post facto argument as to the number of victims. They're closely related, aren't they? They are. They are related. And with respect to loss, I want to go about it a little bit of a different angle, although I agree with a lot of what's been said. I want to sort of follow up on Judge Paez's questions, which are how you define intended loss. And it's our position that what the government is asking for, and what Judge Carter did, is they defined intended loss as reasonably foreseeable intended loss. And it's our position that reasonable foreseeability does not apply to intended loss. And we've relied on this 10th Circuit case called Manitow, and I've provided a 28-J letter about the new amendments coming into the guidelines, which specifically say we think Manitow is correct. And under Manitow, what the government has to show is that... Isn't reasonable foreseeability at a different stage? In other words, the reasonable foreseeability comes about because this is a conspiracy conviction, right? Correct. So it's not because the guideline is that the reasonable foreseeability applies to intended loss. You have to have the purpose. But the question is, who has to have the purpose? Exactly. And because it's a conspiracy conviction, my understanding is that somebody has to have the purpose, but it doesn't have to be this guy. Well, that's the government's argument, and it's our position that that is inconsistent with the relevant conduct provision of the guidelines. The relevant conduct provision says, you're responsible for the reasonably foreseeable conduct, which they define as acts or omissions. They don't say you're responsible for the reasonably foreseeable intent of your co-conspirators. And so... But it's not about conspiracy. In other words, the guidelines are not addressing conspiracy in particular. They're addressing loss in particular. Correct. Right? When you plug that on top of a conspiracy conviction, you switch gears as to whose intent you're looking at, no? I don't think so. Well, I think there are a couple things. One is the argument I just made, which is, you go into relevant conduct provision when you're convicted of a conspiracy or there's jointly undertaken conduct. And what it says is, you're responsible for the reasonably foreseeable acts or omissions of others. It doesn't say what you reasonably foresee. It says reasonably foreseeable, which is objective, right? Correct. Okay. But what you objectively can foresee that your co-conspirators may do, but not what they may intend, if you're understanding the difference. I understand it, but I don't know how you get there. I get there from... You're already dealing with a, you know, a vicarious crime. Right. But the way the guidelines have defined reasonable relevant conduct is they've said acts or omissions of your co-conspirators, not their intent. And then also the specific guideline itself, 2B1.1, makes this distinction between intended loss and actual loss, and only reasonable foreseeability only applies to actual loss. So it's our position that the government has, you know, asked this court basically to adopt a reasonable foreseeable intended loss theory, which the court should reject. I also... Let me ask you this. If you're in a conspiracy and you know that two of your co-conspirators are going to do X, Y, and Z, why aren't you just responsible for that? Even though you didn't intend for that to happen. Well, there are a couple of things. First, you would only be responsible if that was part of your jointly undertaken activity. For example, if you're in a conspiracy and you agree I'm going to distribute, you know, five kilograms of marijuana, but you also know that your co-conspirators transact in all sorts of large quantities of cocaine, which you have nothing to do with, you're not responsible for that, even though you actually know that. The whole conspiracy is to distribute drugs and whatnot. Right. But you're only responsible for your jointly undertaken agreement. I mean, the guidelines are pretty clear about that, that if you don't agree to engage in 100 kilos of cocaine, you're only agreeing to distribute five kilos of marijuana. You're not... Even though you know they're going to go ahead and do that, you're not responsible for that. I do want to address the... It doesn't fall within reasonable foreseeability. Well, it may be reasonably foreseeable, but it's not part of your jointly undertaken agreement. So then how do you put this all together for purposes of calculating loss in the context of a conspiracy? It's our position that the government gets to do two things. One is they have to define what the jointly undertaken scope is of the defendant's activity. And then for actual losses, they get to hold the defendant accountable for all reasonably foreseeable actual loss within the scope of that jointly undertaken activity. And what's the amount here? For Mr. Sheriff Petrosian? For Mr. Sheriff Petrosian. As far as actual losses, they were negligent. Reasonably foreseeable. Reasonably foreseeable. Even under the government's submission, it was like $40,000 or something like that. That's it? That's it. And that's ER-59. Okay, now go on to the next step. Okay, then they get to, for intended loss, they have to show that you, this specific defendant, knew about and intended this particular loss. So in this case, they would have to show that Mr. Sheriff Petrosian knew about all these other accounts, which he didn't, and they have no evidence of, and that he intended those particular losses. Well, what about if he knew that these other individuals were going to go do the same thing? That he would do it? A lot. A lot? A lot. Right. Well, first they would have to show that he... Had something to do with setting up the way in which they were doing in, you know, organizing the system and so on. Right. Well, first they would have to show that he knew about all these account values that are... You're saying that, but why? And what Judge Pius is asking is why does he have to know all of that, as opposed to knowing that he set in motion a system which is going to do this? Right. Well, I guess we go back to Manitow, and my argument, which maybe is not convincing the court, that you have to, you're not responsible for the reasonably foreseeable intent of your co-conspirators. You're only responsible for the reasonably foreseeable conduct or acts of your co-conspirators. So even though he may know theoretically that these guys are going to continue to do this and do all this other stuff, that is not, if he doesn't know about all these other accounts, values... What, do you have a case that supports that? In a conspiracy context? Manitow is not a conspiracy case, but I don't think there's any case. I mean, I think this is the first case. The government is arguing that you can do this, and it's our position that you can't. What about the ex post facto? Okay, ex post facto, very quickly, is all the substantive counts of convictions against Mr. Scherbetrosian were before November of 2009. The only thing that they have, as far as his convictions, is a conspiracy conviction which straddles that date. It started before and it ended after. But the under Forrester, the government has to show, they have to come up with, they should have requested a specific finding by the judge in this case, because it was a bench trial, that the conspiracy and Mr. Scherbetrosian's involvement in it extended past November of 2009. The judge asked him, do you want written findings? The government said, no, we don't. The judge rendered a general verdict, both the written verdict and his oral verdict, mentioned... But is this different because it's a bench trial? I don't think so. Unlike Forrester, just a minute. Consequently, even if he... I mean, we know for sure, it's kind of a futile endeavor, is it not, to send it back to the judge and say, OK, when did the conspiracy end? And there's no reason why he couldn't simply do that, because he was the one who made the findings anyway. So, and we know what he thought, because we know how he applied the loss figures. So he obviously did think it extended beyond it. And it's a ministerial task for him to state when it ended. But the difference is that when you have a jury, if you didn't ask them, they're gone and you can't ask them again. Well, you know, and Forrester is a guilty plea. And this court didn't send it back for the judge to make a finding as to when the conspiracy ended. This court sent it back... Well, he didn't plead guilty to it. They could have asked him to plead guilty to it, but they didn't. But here we had a trial. And it was a bench trial. And the judge, arguably, let's say he omitted one finding that he needed to make. He can make it now, right? Well, I don't think so. And I think this situation is better here. I mean, there's double jeopardy implications involved. Well, why wasn't it just implied? He found him guilty of account one, the conspiracy, where all this was alleged. Because it's not an element... The data is not an element of the offense. That's what Forrester says. That there, when you... That was still a finding. Well, there are five findings. He found him guilty of count one. Right. And under Forrester, the date of the conspiracy is not an element of the offense. So either there needs to be a specific finding as part of the verdict, or as part of the guilty plea, you have to actually admit the date of the conspiracy. And in this case, I think they're double jeopardy concerns. If you were to send it back, he's already had his trial. He's had his verdict. And now he gets to go back and render a new verdict on remand. It's all about which guideline, which volume of that, which edition of the guidelines apply, right? Right. But it's important. That's the ex post facto. I mean, it's only relevant to the guidelines. So why can't he make a finding? Because, well, he's had... Again, I think it's a double jeopardy problem. He's had his verdict. The verdict's been entered. It was a general verdict. The whole problem is the claim of ex post facto. You're applying a greater sentence. I mean, the consequences are greater for conduct, for his conduct. Correct. That's what the problem is. Yes. That's why this is important. Yes. And the conviction that he had after his trial had no findings that he engaged in conduct after November 1st of 2009. And to send it back now, and so you get to render a new verdict, where you can specify in your verdict that the conspiracy count extended, and his culpability for it extended past November 1st, 2009. Why does it have to be in a verdict when it's being done by the judge anyway? I mean, the only consequence of this is which guideline book applies, right? Correct. So why does it have to be in the verdict? Well, that's what Forrester... Either it has to be part of the plea, or at a trial, it has to be part of the verdict. And in this case, we have a verdict. We had a trial. We had a verdict. There was no finding. And it would violate double jeopardy to announce a new verdict on remand. And the government was given the opportunity. I mean, it's not what... The government... He said, do you want written findings? The government said, no, we waived them. So why does the government get a second bite at the apple where Mr. Sheriff... Generally, if you have a bench trial, and the judge can't modify his findings... I mean, it seems awfully artificial to say that since he was there, and he saw the trial, and he decided whatever he decided, he can't tell you what he decided? Well, I think that the law has created sort of this solemn moment in the act where a verdict is rendered. And there was a time for that. The government had ample opportunity to request the findings. They didn't. They waived it. And now, later, to say that, well, the judge, you know, the government gets a redo, and the judge gets a redo after this solemn moment of a verdict has been delivered, we think is a double jeopardy problem. Okay. Let's hear from the government. We'll get one more. Oh, my gosh. Good morning, Your Honors. If it pleases the court, Michael Rabb for Petitioner Margarian. And my client, I'll start by saying, is the only defendant who elected to proceed by way of jury trial. So he did raise some trial issues. I'll address those briefly, but submitting on the 404 other crimes evidence argument, it was properly briefed by the parties. But he does want me to raise the severance in the speedy trial issue, and I'll start with the speedy trial. The record below does reflect that Mr. Margarian objected and persisted in his right to a speedy trial at every stage where a continuance was requested by the other defendants in the case. And that occurred on a variety of occasions, to the point where the trial occurred over a year, slightly, but over a year from the date for him when he believes it should have occurred, absent the finding of good cause for the other defendants that Judge Carter did find. He believes that he did not waive his right or the ability to raise that issue by way of not technically making a motion to dismiss, because he did object at every opportunity. And I think the government's argument should not be heeded by this court to require him to say, I move to dismiss, or to have his counsel do it, or for him to do it pro se at some point is unnecessary when he persisted at every opportunity given to him. And I would point out that I think Judge Carter's findings that the case was complex really don't relate at all to him. There were thousands of wiretaps, tens of thousands, intercepted phone calls, a variety of evidence, none of which he was captured on. None whatsoever. But the complexity of the case against the others and your speedy trial argument then intersect with your severance argument. Absolutely. So long as he is not severed, the complexity of the case considered as a whole counts against him. And I understand that. Like so many of the issues in this case, they dovetail together. At least Mr. Margarian's trial issues do. And he did request a severance as well. And while we all here, I think, recognize that the speedy trial right and your persistence in having a speedy trial cannot be used simply to tactically gain severance. I think the issues do dovetail very closely. He could have been severed out easily. This is part of a rimless conspiracy, we believe, as it relates to Mr. Margarian, because the evidence directed toward him was very limited in terms of the isolated acts and his level of participation. So for those reasons, Mr. Margarian does believe that the court committed error when the court below decided or refused to either grant him a speedy trial or sever him from the case. Based on those comments, I'll submit on those arguments because, again, I think they were briefed your honors have any particular questions. Moving on to the loss issue. Counsel have properly framed the issues and it appears to me the courts understand them. I think the difficulty, again, as was pointed out, is that a conspiracy is broadly pled, the times are broadly alleged, and the instances of each individual's participation is fairly isolated unless one is an organizer or a leader caught directing others to do things. And this dovetails with what each individual knows, what each individual intends, the level of participation, because while someone may be part of the overall conspiracy. My boss was Mr. Margarian. He was sentenced basically for everything. From his arrival on the scene in 2009 when he was arrested in Burbank with a single check and a thumb drive that Mr. DeBoyan possessed through his arrest in 2011. Now, I will concede that the jury did find him guilty of conduct that occurred in 2011 and 2009, but acquitted him of intervening conduct. He was basically not on the scene in terms of the evidence from the arrest on 2009, Silla's conduct in 2011. But he was given a, the court found an offense level 20 based on $7,100,000. He was not on the scene. He was found not to have done the particular things he was charged with doing. I'm sorry, Your Honor? We don't know he wasn't on the scene. We know that whatever the particular things they charged him with. When I say, and I think what other counsel indicated, when someone wasn't on the scene or wasn't engaged in the conspiracy, what I'm indicating is there's no evidence that he was. Certainly any individual may have been involved in a variety of things, but what the courts require is some affirmative evidence in order to hold somebody criminally culpable, whether it be for a substantive count or whether it be for sentencing. And Mr. Margarian's position is that if the court assumes that there were no problems in the trial and the conviction is appropriate, that while he is responsible in the conspiracy because he was found guilty of conspiratorial conduct by the jury, the court still must specifically parcel out his particular responsibility when dealing with these loss issues because they are separate issues. You would disagree with Judge Carter if he found actual loss attributable to your client of about $3 million. He found... An actual loss. I'm not talking about intended loss. And I would, I disagree with Judge Carter. I think he basically threw him... What is your position on the amount of actual loss that Mr. Margarian should be held? My position is that the court must entertain a more specific fact find. Think of the question. Oh, I think it should be... $100,000, $1 million? I think it should be limited to the conduct on the date he was arrested in Burbank. That would include the check that he possessed for deposit because I think the evidence is sufficient there. I think he should be held accountable for the number of accounts found on the zip drive that Mr. Del Boiner was placed above the car after their arrest. I think he can be found responsible for the other crimes evidence, which was admitted based on the check that he intended to deposit, I think $79,000, and then some skimming devices. And then I think he should be held responsible at the end of the conspiracy for the amounts that were on the Brahm account, the $500 ATM deposit. And then Mr. Saboio, I think was... You don't have a bottom line, thank you. Bottom line is I think it should be under a million dollars. I think it should be. And I think that Judge Carter made a mistake by holding Mr. Margarian responsible for these vast amounts when the evidence introduced at trial demonstrated he was a runner, depositing one check, possessed some thumb drives, and then made one $500... So the evidence could also be... You could also construe this evidence as they knew what everybody else was... They knew what was going on. That you don't have to. They knew. And I understand the court's comments. They walk around with a thumb drive with what was 100 and some odd accounts on with all that data. There were more than that. Over a thousand? Correct. Just a little bit over. Okay. Not something you carry around. And I understand. But there's no evidence that Mr. Margarian knew the number of accounts or the particular pieces of data on that. There's no evidence that he... He's not on any of the wiretaps. He appears, I think, despite Judge Carter's findings, based on the evidence, to have been a low-level runner. He's not planning these things. He's not depositing checks. He's at the lowest end of the spectrum. In terms of his conduct. And to give him 20 years for that, based on these amorphous broad concepts, where there are insufficient factual findings, in my view, I think is rather shocking. How much was it brought... This is a question I asked earlier, but now a variation on it. How much was it brought to Judge Carter's attention? The difference between the liability for the conspiracy, that is to say, you have to withdraw, and the liability in terms of sentencing for amount of actual or intended loss, either by our case of Judge... In Judge Reimer's opinion in Latham, or in the Eighth Circuit opinion in Spotted Elk. How much was he focused on that? And how much... Or I'll say it this way. How much did you and your fellow attorneys focus him on that distinction? Well, Mr. Bargarian had a separate trial counsel. Somebody else came in for the purposes of sentencing, and I'm here now. But I did review the sentencing brief that was filed by the attorney that represented him there. There was really no withdrawal argument. That wasn't made. The argument that was made was what we've been talking about in our briefs in here this morning is foreseeability. What should we hold Mr. Bargarian responsible for, even though he's been convicted of the overarching conspiracy? Because even though we have that, we still have to parcel out his conduct. I think what was in his mind, what he knew to hold him responsible for the conduct of others. So the counsel at sentencing limited really to what I indicated today, although he may not have even conceded the amounts in the thumb drive because those were in Mr. DuBois's pocket. So, you know, why should we hold him responsible for that? But I think there was enough evidence to do so, even under the scenario we have here. Thank you very much. Okay. Now we get to hear from the government. Please support Joe McNeil on behalf of the United States. Let me actually start with, I think, the question you raised in terms of, I think, the focus of sentencing with Judge Carter, Judge Fletcher. This is a case, and I think you have to step back for a second, where the district court ultimately presided over 20-some sentencings. And in doing so, I think the picture you get today is everybody saying, well, he hit me with everything. If you look at, I think, the totality of the sentences in the case, nothing could be further from the truth. It's a case where, with respect to every single sentencing, he was called on to make, you know, calls and draw inferences regarding foreseeability. That was the litigation at sentencing. The arguments with every defendant from, you know, the- Let's step back to the legal question because it's rather murky. I.e., what exactly is he supposed to be focusing on with respect to criminal activity for the loss purpose? I think that the focus is on knowledge of the scope of the operation, the defendant's understanding of the roles, of the extent to which the scheme operated, the various components of the scheme. I think that is the focus when you ultimately have to assess- But we have time period problems. That's the main thing that's being brought to our attention now, right? And so, assuming that these people- I mean, if somebody is very active at some part, period, and he knows that these people are doing all this stuff, and then he just, you know, goes to Timbuktu- I know that didn't happen here, but suppose he did. Then what? Is he responsible for what else happens?  he knows these people are still doing it, and he knows that, you know, that they have all these schemes and plans and so on, but he's not doing anything anymore. Well, I think it depends. I think it depends on the individual's role in the scheme. If it's things that they ultimately- a scheme that they ultimately put together at the beginning and recruited people for, and ultimately the people that they recruited continue to participate in that scheme, they're certainly responsible. And that's, you know, what I'd like to do is walk through the defendants individually in terms of the relevant conduct. But that's exactly what- But where are we getting the standards from? I mean, if it's different from conspiracy, you agree with that? Correct. All right, what's different about it? Well, I think it's a narrower concept in that you could have a, for example, a runner in a scheme who ultimately agrees to cash a fraudulently obtained check. And by doing so, they're certainly guilty of participating in this conspiracy. But at sentencing, can the district court hold that runner accountable for tens of millions of dollars in loss? And my answer to that would be no. And in fact, I think that was Judge Carter's view at other sentencings when you were dealing with defendants who are not, unlike these folks, at the very top of the pyramid, to use Judge Carter's words. And so certainly- And Markian was not at the very top of the pyramid. Well, I think that he's probably somewhere in between. And, you know, I think that if you look at the evidence with Margarian, and I think with all due respect to Mr. Margarian, he entirely mischaracterizes the extent of his involvement in the scheme. And maybe I can talk about that for a moment and transition into that. You know, I think to really understand this, you have to step back to how this gets started, I think, in 2005. And I have a little time, so I'll take a minute to do that. But I think it may help the court to understand, I think, some of the relevant conduct findings. And this is a scheme that started, the testimony is undisputed, in 2005 by Mr. Brown, Mr. Cox, who's intercepted on the wiretaps that Mr. Brown is dealing with while at Avondale State Prison. Mr. Hawkins comes along and is participating by 2007. Mr. Benson is recruited by Brown and Cox while he's in state prison. And they basically continue to run a massive scheme where they recruit dirty bank insiders, including people like Nakia Brooks, who was ultimately being used to obtain information both before and after the wiretaps in this case. They use that information to essentially take over people's accounts, to drain those accounts entirely. And I think this goes to, I'll come back and talk about MANTOW.  unless there'd be any doubt, the only intent was to completely drain the accounts. MANTOW talks a lot about holding somebody accountable based on the credit limits of the account. But what's absent in that case is any indication that the defendant actually wanted to drain them. And the record here, and I cite it in the brief, is overwhelming with statements from Sheriff Petrosian, statements from Mr. Brown, that they wanted to take it all. When one of the checks is seized from Mr. Margarian, Mr. Petrosian, for example, gets on the wiretap and says, I'm gonna go after Margarian's father because there was a half million dollars in that account and that's what we were gonna take. And so I offer that as an aside, I think, which is on MANTOW for, I think, a way for the court to distinguish it. But with respect to Mr. Margarian, one of the things that happens once Sheriff Petrosian gets involved is in addition to just having runners cash these checks, he ultimately devises a scheme and he by his own admission, Sheriff Petrosian, Sheriff Petrosian, had been engaged in money laundering operations, fraud operations by his own admissions for, I think, more than 10 years is what he's intercepted saying on the wiretap. And what he ultimately does is comes up with a series of shell accounts, Gaga Carapetian being one, the Veraz Apparel account being one, and then there's another one that Mr. Margarian ultimately used that belongs to Edward Zarkarian. And what you can hear Mr. Sheriff Petrosian saying very clearly over the wiretap is, hey, Brown's been doing this great scheme and we're gonna team up, to use his very words, we're a team, and we're gonna team up and add a whole nother level of sophistication to that. And the sophistication is this, instead of just depositing or, I'm sorry, cashing the checks, they will ultimately try to move those accounts, layer them through accounts that are set up in the names of individuals who have been sent back or deported to Armenia. He says as much on the wiretap. And the subsequent calls are calls with he and Carr and Markosian where they're talking about, making sure the checks they're depositing in one city bank, pulling it out the next. And so the uncontroverted testimony at trial was essentially that what Sheriff Petrosian brought to the table was these money laundering accounts. And- Do we know that that continued after August of 2009? Well, yes. And I think for a couple of reasons. One of the accounts that was used was an account in the name of a guy named Gaget Karapetian. And on the day of the Lambrinos seizure, what happens is Mr. Margarian, there's a series of intercepted calls where essentially Brown's working on the account, on Mr. Lambrinos' account, getting the information, making sure the money's there, talking about transferring money from various linked accounts because it wasn't enough for these guys just to steal from the checking account. They would transfer money from the other accounts into the checking account so they could maximize the take. And Mr. Brown's on there, you hear Mr. Sheriff Petrosian ultimately directing, in this case, his wife, he also used his mother at times to forge checks, directing his wife to ultimately pick up, or I'm sorry, sign the check. And then they were picked up by Karin Markosian. And when Mr. Markosian is stopped, I'm sorry, not Karin Markosian, Mr. Margarian. And when Mr. Margarian is ultimately stopped with that check, it's made out to Gaget Karapetian. And they look for Gaget Karapetian and the name that, and the information on the account doesn't exist, the officers go to a residence, doesn't exist. And what the law enforcement officers testified at trial was this was exactly consistent with what Sheriff Petrosian had been saying over the wiretap was that he creates these in the name of individuals who have gone back to Armenia and don't exist. And so to get your question. But actually my question, which wasn't specific enough, was whether the Brown part of the conspiracy was shown to continue to use this scheme after that period. Well past into 2010 and 2011. And if you look at the spreadsheet, you know, Nakia Brooks, Hawkins, Cox, Brown's closest associates who he started this scheme with, continue to do bank fraud. I think on the day of... Continue to use these cleansing accounts? No, they actually, I don't think that they're using the money laundering accounts. They're continuing to use the bank insiders like Nakia Brooks. Well, I know, but what I'm wondering is, it seemed like what happened here was there were these two groups of people who were doing this stuff and they got together for a short while. But at least in terms of these loss issues, in order to hold Brown for what the Petrosian group was doing after 2009 and vice versa, don't have to show... I understand it was found to be one conspiracy, but in terms of the loss, don't you have to show some continuing interconnection? Well, I think that, can the government show that after the wiretaps go down, Brown and Sheriff Petrosian are working on together on a daily basis? The answer is no. Or at all. Correct. I think after the wiretaps go down, we don't have that. But what we do have is in 2011... How can you show joint criminal activity then? Well, I think that the inference is that these two groups were working very, very closely together. They were intertwined. Well, they worked for a while. That's right. But I think that in 2011, when you find the Daga Karapetian account at Christine Ogunjanian's house, he has credit cards, debit cards still to access that account at Ogunjanian's house. And so that account remains active. I understand that. But what I'm wondering is in order to show joint criminal activity between Brown and Sheriff Petrosian, for example, for both of their loss purposes, don't you have to show that they were continuing to work together in some fashion? I don't think... I think that we ultimately have to show that the individuals ultimately had the requisite knowledge in terms of foreseeability. And that Sheriff Petrosian, for example, was aware of the full scope of Brown's operation. And ultimately... So how is that different from the conspiracy finding? I think that the difference... So tell me exactly what you think has to be proven to show joint criminal activity for loss purposes. I think for loss purposes, the government needs to show a full awareness of the extent of the criminal conduct. If I join with somebody, the government ultimately would have to prove that I have a full understanding of the extent of their criminal... At relevant times? Yes. All right. So what's the evidence of that? How do we know... What the evidence is here that Brown knew what Sheriff Petrosian was doing and Sheriff Petrosian knew what Brown was doing after December 2009? Well, two things. I mean, with respect to Brown, and I think if the court's going down a road where you're looking at Brown's loss, the vast majority of that, that loss on the spreadsheet is essentially Brown loss. He gets to 6 million, over the 7 million mark very easily  If you look at the government... You're saying he doesn't matter? I don't think he matters. I think with respect to Sheriff Petrosian, I don't think he matters either because here's what Judge Carter did. He ultimately, and over the government's objection, held Sheriff Petrosian only accountable for loss that occurred while he was ultimately housed with Brown. And I think that there is... Through August of 2010. I'm sorry? April of 2010. Correct. While Brown is still at Abeno State Prison. I think he cuts it off once Brown... What difference does it make whether he's there? They still have to work together. Well, I think that he's intercepted on the wiretaps, and I'll give you some sights, basically saying that... When? When were the wiretaps over? During 2009. Right. During the summer of 2009, he's intercepted... So why is the fact... I mean, I thought that was sort of odd, actually. I mean, the fact that they're still housed on the same... I mean, they weren't cellmates, in fact. I was wrong about that. I gather they were... They were on the same hall or something. What does that prove about whether they continue to work together? Are you still to show that they continue to work together? Well, I think that the inference, and where I think Judge Carter didn't commit clear error, is that Sheriff Petrosian's on the wires, sealed excerpts of Record 114, saying he does everything right in front of me. Sheriff Petrosian, who ultimately provides government's record, the phone chip that ultimately he's using while at Abeno to commit the fraud. But then there were arrests. In the summer of 2009, there were arrests, right? I'm sorry? There were arrests in the summer of 2009. There was an arrest of Artush Margarian and Del Boyan. Right. But that didn't cut off the activity. And in fact, they went back to continuing to engage in the fraud. I mean, immediately after the arrest. Together? We know that they kept doing it together. There's wiretaps after. I think that happens in August. And there's calls after that standpoint. So I don't think it's an issue. I think it's beyond dispute that they continue. Now, the question is, once the wiretaps go down, what's the inference that the court's to draw? And what the inference Judge Carter drew was that Sheriff Petrosian especially. And I think that if you're going to divide this out, separate out Sheriff Petrosian and Brown. Because I think those are the two guys more than anything, where the record's overwhelming that it is a very, very tight partnership. You know, Sheriff Petrosian's statements on the wiretap to Marcosian and others on the outside are, you know, not that he's just going to work with Brown. But he has a full understanding that Brown has a team. In his words, excerpts of record 39, we are going to work with this group. And so I don't think that there can be any doubt that Sheriff Petrosian knows exactly what he's getting into. He knows that he's not just teaming with Brown, but that all the resources on the outside that Brown brings to the table, including Kelly Benson, who can steal the checks that Sheriff Petrosian acknowledges on the wiretap. And so I think with respect to Sheriff Petrosian, even though he was tightly linked to Margarian, who's caught in 2011 at his house with papers that discuss, you know, I told you one of the hallmarks of the fraud was transferring money between the accounts. Margarian's caught in 2011 at his house with paperwork discussing how to transfer balances, put skimmers on pumps. And so even though I think the inference from the record is that Margarian is lower than Sheriff Petrosian on the totem pole, Judge Carter actually backed off on Sheriff Petrosian and opted just to hold him as well as with Brown, because it was clearly overwhelming from the record that this was his partner in prison. Again, he does everything right in front of me and Sheriff Petrosian aiding and abetting Brown by providing him a telephone chip by ultimately integrating their operations and him also bringing something to the table. So I think that those two are distinguishable. I think with respect to Brown's foreseeability, Judge Carter determined both he and Brown were essentially at the top of the pyramid in terms of their knowledge of the fraud scheme. With respect to Brown, you have Kelly Benson basically testifying that they were doing this on a daily basis, ordered hundreds of boxes of checks. I think the court could sustain on a clear air standard the findings on... And Benson said when that was? He said that it started, that Brown had been doing it for a while with Cox and that he got involved initially in 2007. Brown admits in his plea agreement that he started doing this in 2005. Indeed, his counsel at sentencing conceded Brown's been involved from the very beginning, I think is what he said. We don't dispute that. He and Cox ultimately pointed the finger at each other as to who were the mastermind. But I don't think for purposes of the district court's relevant conduct findings on Brown, it very much matters. Let me also address, I think this notion that the court was required to cut off Brown's liability with respect to losses just because he's in prison. I mean, one of the things that happens here and that I think is factually, makes this case factually unique, is Brown's constantly reintegrating himself in the prison once he's out of prison. And so what I'd encourage the court to do is look at, I think 2005, he ends up getting caught up in Carmel while he's trying to get some checks. They search his car. They find lots of profiles. They interview the victims and the victims have had this transfers occur on their accounts. He's sent to prison and he's out. And what does he do? He immediately reintegrates himself in the conspiracy. He's caught thereafter with Kelly Benson. I don't think there's any problem before the summer of 2009. Question is, most of, as I understand it, most of the loss is in the summer of 2009 and some of it is afterwards. Is that right? Correct. Correct. So let's leave everything before that out of it because it's not going to the loss very much at all, is it? All right. So after that, how do we know who's doing what? Well, I don't think with respect to Brown, we don't have him on wiretaps, but what we know. But you'd say with Brown, it doesn't matter because you can add up just through the summer of 2009 and get there. Right. And with respect to everybody else, with respect to Sheriff Petrosian, I don't think that, frankly, it matters much either because of the things that I talked about, his level of foreseeability and understanding of the scope of the operation. You know, he understood well what was going on. Yeah, I think that's right. I mean, how it's going to be implemented. Correct. Unlike, I think, you know, somebody like Margarian, who I think we could get to the loss a different way. But unlike Margarian, you know, Sheriff Petrosian is actually on the phone talking to Brown's associates. He calls WADSAC and basically complains, hey, these checks keep on blowing up. You know, we've got to start operating like a team. And so do I have, you know, evidence after the wire goes down of another call or another act that Sheriff Petrosian... Or any connection between Sheriff Petrosian and Marcosian and so on and the Brown set of people. Between Marcosian? No, I mean, I think that the answer is Marcosian. Contrary to, you know, his attempt to characterize himself otherwise, is Sheriff Petrosian's business partner. But they are not. There's no evidence. I don't have any calls where they are together. Or anything that shows that they did anything together. Well, no, I think the best argument is that they were a tightly integrated operation. But I do not have evidence of Brown engaging... And does that matter in the sense that some of the losses that are being counted for are traceable through the Brown people, but not through the Sheriff Petrosian people? Well, I think you can make that argument, maybe with respect to Margarian. I don't think that Sheriff Petrosian can make that argument because he knows that exactly what Brown's doing. I'm asking a different question. Were some of the losses that were counted in terms of who was actually doing things after August of 2009, the Brown set of people? Absolutely, yes. Those losses included Llewellyn Cox's transactions, Wadsworth's transactions, Brooks's transactions. It also included, I think, some Citibank transactions. And one of the points I would make is, I think essentially what Sheriff Petrosian is saying is that, or Margarian as well, and Marcosian, is you have to parse this out. And I don't think that you can do that for one reason in particular. One of the things that Sheriff Petrosian brought to the table was these bank fraud profiles. Brown oftentimes would get them from Bank of America. And what Sheriff Petrosian brought to the table was profiles from Citibank and other banks where he had an insider. And so one of, I think, the issues here is those profiles, even after an account gets hit once, the accounts would oftentimes get hit time and time again. Kelly Benson calls them a reloop. And so I think that when you deal with the issue of foreseeability, particularly in Sheriff Petrosian, he knows that profiles are being provided on both sides. The crews are working together. He knows the extent of Brown's operation. And I think as a result, certainly while he's housed with Brown, those losses during that, you know, I think eight month time period of a six year conspiracy are foreseeable. Could you discuss Marcosian? Sure. I think with respect to. With respect to Marcosian, I think what the district court held was that essentially Marcosian was the brains on the outside for Sheriff Petrosian. And one of the things that I think the district court had in this case that you don't have in most fraud cases is wiretap calls where it could draw, I think, very significant inferences in terms of culpability based on what was being said with the calls. And I think that that drove Judge Carter's finding here. And though his counsel says, oh, he's only intercepted on a couple of calls. I think you have to look at the quality of his statements on those calls. One of the things the court found is that, you know, he was Sheriff Petrosian's equal partner. And that's based on a call where they refer to the fact that this is our business, the business of fraud that they're engaged in. You know, during the calls, he ultimately discusses all the extents of the scheme, including Marcosian's well aware that Brown has, that Sheriff Petrosian has this guy Brown in prison who he's working with to perpetrate this fraud. You know, sealed extras to record 220 and three at 305. They talk about having to split this up with another group that they're working with. And so I think the district court ultimately found that he was, sorry, Sheriff Petrosian's equal partner. If you look at the calls and I think the calls in our brief, there's one that sticks out. One of the things I mentioned was these money laundering accounts. And why does he end up getting held for more time than Sheriff Petrosian does? Well, I think that, you know, the answer is that I think the district court found that he was closely connected with Margarian, who's popped into 2011 when his house is searched with profile information. He directly dealt with the Gaget-Karapetian account. That's the account that it's made out to on the Jorge Lambrinos account. That account is found in Cristino Gonjonian's possession around 2011. And who is Sheriff Petrosian's wife? Cristino Gonjonian was Sheriff Petrosian's wife. So she had things, but Sheriff Petrosian wasn't charged with them for loss, but Marcosian was. Yeah, and the government ultimately, you know, at sentencing, told the court that with respect to Marcosian, you know, that it should limit it to probably around where Sheriff Petrosian ended up. But I think that what was ultimately driving, you know, the district court's findings with respect to the loss on Sheriff Petrosian in part was Judge Carter had a very firm view that he would not impose a sentence above 25 years. And so I think that Judge Carter's view, whether or not he held him accountable, just until... I mean, that doesn't make a whole lot of sense, does it? Because he could have done that by varying from the guidelines, but to manipulate the guidelines in a way that ends up holding someone else for a period that doesn't, I mean, it just doesn't seem to be any rational explanation for why they should have different guidelines. I think the only other inference would be the direct supervision that Marcosian, I think, exercised over Margarian. He's the one that ultimately recruited him to do... The real ringling was Sheriff Petrosian. I think that he is, but by the same token, Sheriff Petrosian is locked up, and it's a lot easier for Marcosian on the outside to be directing people to do checks than Sheriff Petrosian, who has to deal with prison counts and so forth. And so I don't think it's an issue of culpability. I just think that at the end of the day, Marcosian was assigned that part of it. I think the only other comment I want to make, I made my comment about Mantau. I think it's distinguishable based on the fact that, just on the facts here, the endeavor was to drain the accounts to purposefully inflict as much loss as possible. And so I think the court can distinguish it on that basis. On the Forrester issue, this is before the court on plein air. Forrester has never held that in a jury trial or a bench trial, a specific factual finding is required as to the time period of the conspiracy. And moreover, I would point out that had Judge Carter been advised of that case or had they objected, the end result is he would have found it. And the reason why is he finds Marcosian and Margarian guilty of overt acts that occur, I'm sorry, Marcosian and Margarian and Oganjanian guilty of overt acts that occur in January and February of 2011. And so on that basis, the court would have easily concluded that the conspiracy continued through that time. What has happened to the other defendants who were sentenced as part of this? Do they have separate appeals? I mean, what's going on with them? So this is the group that ultimately went to trial with the exception of Bill Boyan. The only other defendant left who has a pending appeal at this time is Cox. And that he was sentenced for reasons of continuity of counsel later than the other defendants. And that's a separate appeal. And the opening brief has not been filed, but I think it's due in the next couple of weeks. And how long was Cox sentenced for? He was sentenced equivalent to Brown, about I think around 25 years, maybe a little more than Brown. And the court basically viewed them as equals. I see. So with the exception of Cox and with the exception of the defendants now in front of us, everybody else is finished? Hawkins is actually still pending in the district court. He's had some issues with his counsel, but it's not before this court, but Cox is. Questions from the bench? OK, thank you. Thank you, Phil. Now, I know that we've got a lot that's been said, and I know also that Mr. Walsh at the beginning said he did not wish to save time for rebuttal. But just to make sure that everybody's had a chance to say what they need to say, any of the four of you who would like a minute, please take it. Now, that is to say, each of you has a minute if you want it, right? You're not you're not speaking for everyone. You're speaking only for your client, right? Yes, Your Honor. I think based on the questions, what the government has further conceded is there is no evidence of any interaction between Brown, the Brown crew or crews, because there's also a Hawkins crew there, and Sheriff Petrosian crew, if we call it that, after August, September 2009. So all there is is this inference that the court drew that they were housed at the same facility. So therefore, I can infer that they still were acting together. We don't think that that's a reasonable inference. In addition, even if you were to hold Mr. Sheriff Petrosian accountable for all the intended loss all the way through when he leaves Avenal, we still have our issue, which we never got to, that it should be reduced by three levels because they were never even close to draining the accounts on virtually all of that intended loss. So it's our position that. That is really mysterious because you can't, I mean, intended loss seems to preclude that possibility. Well, there's. His loss is precisely about things that didn't happen. Correct. And the guidelines say you look at if they intended, if they intended $800,000, but they only got $30,000, then you take the, you either take the $30,000 or you take the $800,000 and subtract three levels, whichever is greater. That's what the guidelines specifically say. And that just was not done in this case at all. Thank you. Thank you for giving me one extra minute. There is one comment, even though I didn't reserve any time for rebuttal. And that is the discrepancy between Mr. Sheriff Petrosian's loss figure stopping in April and my clients going to the following February. The court noted that, that led to my client receiving two extra levels on the on loss. My client got 20, a level 20. Mr. Sheriff Petrosian got a level 18. So that, so my client got two extra points for the loss, which put him in a higher guideline area, but also it also led to a lower number of victims because if you stop the, the amount of the loss. No, no, I got that. So you're saying, you're saying, so it should not have been extended for your client. Why? The time period should not have been. Because it seems to be an arbitrary extension. There's no, there's no factual underpinnings for it. And the point I was trying to make is it resulted in two additional levels in the loss and two additional levels in the number of victims. Because if you extend it out to February of 2011, there's a six level increase for 313 victims. I understand the consequence, but I'm trying to figure out why you think that Judge Carter made a mistake in having different endpoints for the two, for the two defendants. Because Mr. Sheriff Petrosian was, was viewed by the judge as an organizer and one of the. Or whether it was Mr. Sheriff Petrosian who got an unfair advantage, but not your, but, but the, there's evidence to support your client. I mean, it's not going to help you if Sheriff Petrosian is, was just given a good deal. Well, I don't think that the point is the guidelines are, have to be accurate, accurately calculated. And if they're not out, I understand that they may have been inaccurately calculated with regards to Sheriff Petrosian, not your, your client. Right, he could have been. I don't see how that could be. If you, if, if the court is finding Mr. Sheriff Petrosian was one of the leaders. He could have been, so maybe he should have gotten taken Sheriff Petrosian after February 2011, but he didn't. And, and that's on the basis that they, they searched Mr. Sheriff Petrosian's wife's home in February of 2011 and find further evidence of criminal activity. And they searched my client's home and there's none. And so, so it doesn't seem logical. Okay, got it. Thank you. One comment, Your Honors. In reference to Mr. Margarian, I think the government concedes and admitted as much today and a little bit in their briefs, there's a hierarchy among the participants. And I think Judge Carter committed error because he failed to recognize that hierarchy as it relates to Mr. Margarian. He was sentenced with loss with the top people and the evidence did not demonstrate that. And Judge Carter failed to parse out, I think, make sufficient findings as to what he did, what he knew, and why he should receive those larger amounts and that it should be remanded for that purpose and for resentencing. And again, we believe that it should be to a different judge because of the animus demonstrated by Judge Carter comparing what he'd like to do, sentence him as a murderer in this particular case. Thank you for your time this morning. Thank you, Your Honor, for the extra minute. Mark Kubrick for Mr. Brown. Just want to make two comments. One is that the prosecutor has gone back to, well, he did this while he was outside and all of that. But he actually was arrested and served state time for those two incidents where he was caught doing something outside. And in fact, that time was taken off of his federal sentence. The estimates that I gave in response to Your Honor's request of what I thought the loss should be took into account all of the time periods where there was evidence related to Mr. Brown. And that, plus the fact that you have to deduct victims and losses where there is no pecuniary loss is where we come down to our recommendation to the district court and to Your Honors of a $400,000... But that ties into the expose factor, right? Because if the new guideline applies, then you don't do that. Yeah, but Mr. Brown's participation and the evidence against him only extended up until 2009. So you're just making the same argument a second time. Yeah, it's the same thing I said in my brief and was said by other counsel. The expose factor would prevent it from applying to anything before 2009. Okay, thank you. Thank all counsel. United States v. Marcosian et al. Now submitted for decision. And that finishes our argument session for this morning.
judges: Fletcher, Paez, Berzon